IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| OLGA BELL AND SABRINA BELL, | § | |
| | § | MDL NO. 2543 |
| *Plaintiffs*, | § | 1:14-MD-2543-JMF |
| | § | |
| v. | § | HON. JESSE M. FURMAN |
| | § | |
| GENERAL MOTORS, LLC, | § | CIVIL ACTION NO. |
| | § | |
| *Defendant*. | § | AMENDED COMPLAINT |
| | § | |
| | § | JURY TRIAL DEMANDED |

**PLAINTIFFS' FIRST AMENDED AND SEVERED ORIGINAL COMPLAINT**

Pursuant to Order No. 146 (Docket No. 5301) and Order No. 144 (Docket No. 5296), Plaintiffs Olga and Sabrina Bell (hereinafter "Plaintiffs"), through the undersigned counsel, are hereby amending their original complaint, originally filed on July 29, 2014, as a multiple-plaintiff consolidated complaint, *Abney, et al., v. General Motors LLC*, 1:14-cv-05810-JMF. Plaintiffs respectfully represent the following:

## I.    INTRODUCTION

1.    This action arises out of a motor vehicle accident that occurred on October 8, 2011. On that date, Plaintiff Sabrina Bell, the driver of her 2008 Chevrolet Malibu (VIN 1G1ZS58N58F110834) ("Subject Vehicle"), was stopped at a stoplight in Las Vegas, Nevada, when a truck rounding a corner rear-ended the Subject Vehicle. Plaintiff Olga Bell, Sabrina's mother, was a passenger in the 2008 Chevrolet Malibu. Plaintiff Sabrina Bell was unable to control the Subject Vehicle immediately thereafter and rear-ended the vehicle in front of her. Upon information and belief, a defect in the Vehicle's Body Control Module ("BCM") caused a brake light malfunction which ultimately led to the crash, and further disabled the vehicle's Electronic

Stability Control ("ESC"), traction control, and panic braking assist features. The Plaintiffs were seriously injured as a result of the accident.

2. Prior to the accident on October 8, 2011, Defendant General Motors LLC ("New GM" or "Defendant") knew that the Subject Vehicle was defective, yet failed to adequately disclose the defect or warn users of its existence. Rather, Defendant negligently, intentionally, purposely, fraudulently, and systematically concealed the defect from Plaintiff, the federal government, and the public at large.

3. Accordingly, Plaintiffs Sabrina Bell and Olga Bell bring this damages action against New GM asserting claims for negligence, fraud, and strict products liability.

## II. PARTIES

4. Plaintiffs are residents of the state of Nevada, and the crash that is the subject of this lawsuit (hereafter the "Subject Incident") occurred in Las Vegas, Nevada.

5. Plaintiffs assert claims against Defendant General Motors LLC for personal injuries stemming from the Subject Incident involving Plaintiff Sabrina Bell's 2008 Chevrolet Malibu (VIN 1G1ZS58N58F110834).

6. Defendant New GM is a citizen of Delaware and Michigan, and does business in all fifty U.S. states, including the State of Nevada. General Motors LLC's principal place of business is in Detroit, Michigan.

7. Defendant New GM is a limited liability corporation with one member: General Motors Holding, LLC. General Motors Holding, LLC is a citizen of Delaware and Michigan, and is a holding company and direct parent of General Motors LLC. General Motors Holding, LLC is a limited liability corporation with one member: General Motors Company. General Motors Company is a citizen of Delaware and Michigan and is publicly traded.

8.     General Motors Corporation ("Old GM") was a Delaware corporation with its headquarters in Detroit, Michigan. Prior to July 10, 2009, Old GM, through its various entities, designed, manufactured, marketed, distributed, and sold Chevrolet, Pontiac, Saturn, and other brand automobiles, including Plaintiff's 2008 Chevrolet Malibu, in Nevada, elsewhere in the United States, and worldwide.

9.     In June of 2009, Old GM filed for bankruptcy. On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets pursuant to a Master Sales and Purchase Agreement ("Agreement"). The Agreement became effective on July 10, 2009. The Agreement approved the sale of Old GM's assets to Defendant New GM.

10.     The Agreement defines Defendant's "Purchased Assets" as:

> (xiv)     all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

> (xv)     all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . . .

AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT at Section 2.2.

11.     Along with the Purchased Assets, New GM also expressly took on a range of liabilities. "Liabilities" is defined in the Agreement as "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent,

determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

12.     Among many others, the Liabilities assumed by New GM under the Agreement include:

> (vii) (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties and delivered in connection with sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser [i.e., new GM] prior to or after the Closing and (B) all obligations under Lemon Laws; . . .

> (ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance; . . .[1]

> (xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; . . .

13.     New GM also undertook contractual responsibility for compliance with a wide range of laws and other regulations, including:

> (a)     From and after the Closing, Purchaser [Defendant New GM] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].

> (b)     From and after the Closing, Purchaser [Defendant New GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] . . . (ii) Lemon Laws.

---

[1] Pursuant to an order of the bankruptcy court, this particular category of assumed liabilities is "regardless of when the product was purchased."

14.     Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant New GM purchased the assets of Old GM and hired many, if not most, of Old GM's employees including, on information and belief, most of the same senior-level management, officers, and directors.

15.     Allegations pertaining to Old GM are included herein because (a) with respect to claims involving personal injury, death, and property damage, among certain other claims, in Old GM manufactured vehicles, New GM expressly assumed liability for certain conduct and liabilities of Old GM, and (b) New GM also acquired knowledge of Old GM's activities and the common defects in many GM vehicles' braking systems and body control modules ("BCMs"), as well as other serious defects identified herein, via the mind of the employees, officers, managers, books, and records obtained and/or acquired as a result of the Purchase Agreement and subsequent Sale Order, as further defined by the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al.*, *f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).  Thus, the conduct, knowledge and duties of Old GM are part of the foundation for the liabilities assumed by New GM, as the Plaintiffs base their claims on a crash involving an Old GM vehicle which, due to Old and New GM's wrongful, negligent actions and inactions, caused Plaintiffs personal injury and property damage and New GM is, therefore, liable to Plaintiffs. All causes of action and attributions of liability are directed solely against Defendant New GM.

16.     At all times relevant to the claims in this lawsuit, Old GM and/or New GM were in the business of developing, manufacturing, and marketing cars throughout the United States generally, and specifically in the Plaintiffs' state of residence.   New GM has a network of

authorized retailers that sell its vehicles and parts throughout the United States. New GM maintains its principal place of business at 300 Renaissance Center, Detroit, Michigan.

### III.    JURISDICTION

17.    This Court has diversity jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00 and the Plaintiffs and New GM are citizens of different states. By filing the present Amended Complaint in this District pursuant to Order No. 146 (Docket No. 5301), however, Plaintiffs do not waive the right to transfer this case to any other appropriate jurisdiction at the conclusion of pretrial proceedings

### IV.    FACTUAL BACKGROUND

**A.    The October 8, 2011 Incident**

18.    On October 8, 2011, Plaintiff Sabrina Bell was at a stoplight in the Subject Vehicle in Las Vegas, Nevada, with her mother, Plaintiff Olga Bell, in the passenger seat, when a truck rounding a corner rear-ended the Subject Vehicle on October 8, 2011.  Plaintiff Sabrina Bell was unable to control the Subject Vehicle immediately thereafter and rear-ended the vehicle in front of her.

19.    Upon information and belief, the BCM defect manifested in Plaintiff's vehicle, causing a brake light malfunction that ultimately caused the Subject Incident, and further caused or contributed to the subsequent loss of control. The Plaintiffs were seriously injured as a result of the crash. Plaintiff Sabrina Bell sustained, among other things, cervical spine musculoligamentous, cervical and thoracic sprains, post-traumatic headaches, myospasm and edema secondary to the subject motor vehicle collision. Plaintiff Olga Bell sustained, among other things, serious neck and back injuries as a result of the crash.

**B.    The Defective Vehicles**

20.     Plaintiffs' personal injury claim involves a Defective Vehicle, specifically a 2008 Chevrolet Malibu which contains multiple dangerous safety defects. As used herein, the "Defective Vehicles" include vehicles subjected to NHTSA Recall No. 14V-252, involving over 2.4 million GM vehicles that were recalled for common safety defects stemming from their braking and Body Control Module connection systems (hereinafter "the BCM Defect"). The models affected by the 14V-252 Recall are: 2004-2012 Chevrolet Malibu, 2004-2007 Chevrolet Malibu Maxx, 2005-2010 Pontiac G6, and 2007-2010 Saturn Aura. The Subject Vehicle, Sabrina Bell's 2008 Chevrolet Malibu, was included in NHTSA Recall No. 14V-252.

21.     In addition to the BCM Defect, the Subject Vehicle has multiple other safety defects that manifested while Plaintiff Sabrina Bell was driving, which New GM has refused to adequately repair; specifically, the vehicle's Electronic Power Steering ("EPS") assist continues to go out intermittently, but because New GM has not recalled the Subject Vehicle for an EPS defect, New GM refuses to replace Plaintiff's EPS motor free of charge, and Plaintiff is unable to afford such replacement and has been forced to drive a vehicle with a dangerous safety defect present.

22.     To Plaintiffs' knowledge and understanding, the Subject Vehicle had not been substantially modified or changed in any material way from its initial condition as designed, manufactured, marketed, and sold by Old GM.

23.     An automaker should never place profits above safety and should never conceal from consumers or the public any defects that exist in its vehicles. New GM's Vehicle Safety Chief, Jeff Boyer, has proclaimed that "Nothing is more important than the safety of our customers in the vehicles they drive." *GM Announces New Vehicle Safety Chief*, available at http://democrats.energycommerce.house.gov/sites/default/files/documents/Testimony-Barra-GM-Ignition-Switch-Recall-2014-4-1.pdf.

24.     Indeed, the first priority of a car manufacturer should be to ensure that its vehicles are safe and, in particular, have functioning safety systems/features that can prevent or minimize the threat of death or serious bodily harm in a collision.  In addition, a car manufacturer must take all reasonable steps to ensure that once a vehicle is running, it operates safely, and its critical safety systems (such as braking functionality and Electronic Stability Control) work properly until such time as the driver shuts down the vehicle.  Moreover, a manufacturer that is aware of a dangerous design defect that causes a vehicle to suddenly and unexpectedly lose braking functionality or brake light operation must promptly disclose and remedy such defects.

25.     To date, Old GM and New GM have designed, manufactured, marketed and/or sold more than 2 million GM-brand automobiles affected by the BCM defect.

26.     In addition, or in the alternative, Old GM and New GM have sold millions of vehicles suffering from other, similar, potentially life-threatening major defects.  As will be shown at trial, all the knowledge of Old GM with respect to these defects was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al.*, *f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

**C.     The BCM Defect (Recall No. 14V252)**

27.     On May 14, 2014, New GM issued a safety recall of approximately 2.4 million model year 2004-2012 Chevrolet Malibu, 2004-2007 Malibu Maxx, 2005-2010 Pontiac G6, and 2007-2010 Saturn Aura vehicles with a dangerous safety defect affecting the subject vehicles' braking systems and Electronic Stability Control ("ESC").

28.     In the affected vehicles, the brake lamps may fail to illuminate when the brakes are applied or illuminate when the brakes are not engaged.  Moreover, the same defect can disable,

*inter alia*, traction control, ESC, and panic brake assist operation, thereby increasing the risk of collisions and injuries.[2]

29.     Traction control, ESC, and panic brake assist are all critical safety features in any motor vehicle. As General Motors has noted, the Insurance Institute for Highway Safety (IIHS) and the National Highway Traffic Safety Administration (NHTSA) have found that ESC systems "could have the potential to reduce single vehicle fatal crashes by 50% or more."[3] By law, all passenger cars, trucks, vans and SUVs with a gross vehicle weight under 10,000 pounds are required to have ESC.[4] Crashes are prevented by ESC, as ESC allows drivers to maintain control of their vehicles in emergency or panic situations.

30.     New GM knew of the dangerous BCM Defect for years, including prior to the crash that gives rise to Plaintiffs' claims, before it took anything approaching the requisite remedial action. Despite repeated crashes between the time or shortly after New GM came into existence and the recall date, New GM did not recall all 2.4 million vehicles with the defect until May 2014.

31.     According to New GM, the BCM Defect originates in the Body Control Module connection system. "Increased resistance can develop in the [Body Control Module] connection system and result in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause service brakes lamp malfunction."[5] The result is brake lamps that may illuminate when the brakes are not being applied, and that may *not* illuminate when the brakes *are* being applied. This increases the likelihood of drivers who are behind the Defective Vehicles

[2] New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.
[3] Exhibit MDL-1956 (GM-MDL2543-401904307).
[4] *See* FMVSS 126, 49 CFR Parts 571 & 585, *Federal Motor Vehicle Safety Standards; Electronic Stability Control Systems; Controls and Displays*, available at https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/fmvss/ESC_FR_03_2007.pdf (last visited Apr. 28, 2018).
[5] New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

to misinterpret/rely upon erroneous or lacking brake lamp illumination, thereby increasing the risk of a crash.

32.     The same defect can also cause the vehicle to get stuck in cruise control if it is engaged, or cause cruise control to not engage, and may also disable the traction control, electronic stability control, and panic-braking assist features.[6]

33.     New GM now acknowledges that the brake light defect "may increase the risk of a crash."[7]

34.     New GM knew from the date of its inception that as early as September 2008, NHTSA opened an investigation for MY 2005-2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver does not depress the brake pedal and may *not* turn on when the driver *does* depress the brake pedal.[8]

35.     New GM knew that during an investigation of the BCM Defect in 2008, Old GM had discovered elevated warranty claims for brake light defects in MY 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the [Body Control Module] C2 connector was the root cause" of the problem.[9] New GM was aware that Old GM and its part supplier Delphi "decided that applying dielectric grease to the [Body Control Module] C2 connector would be an effective countermeasure to the fretting corrosion."[10] Beginning in November of 2008, the Company began applying dielectric grease in its vehicle assembly plants.[11]

36.     New GM also knew that on December 4, 2008, Old GM issued a Technical Service Bulletin ("TSB") recommending the application of dielectric grease to the Body Control

---

[6] *Id.*
[7] *Id.*
[8] *Id.* at 2.
[9] *Id.*
[10] *Id.*
[11] *Id.* at 3.

Module C2 connector for the MY 2005-2009 Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx, 2008 Malibu Classic, and 2007-2009 Saturn Aura vehicles.[12] One month later, in January 2009, Old GM recalled only a small subset of the vehicles with the BCM Defect – 8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January 2005.[13]

37.     Not surprisingly, the brake light problem was far from resolved.

38.     In October 2010, New GM released an updated TSB regarding "intermittent brake lamp malfunctions," and added MY 2008-2009 Chevrolet Malibu/Malibu Maxx vehicles to the list of vehicles for which it recommended the application of dielectric grease to the Body Control Module C2 connector.[14]

39.     In September 2011, New GM received an information request from Canadian authorities regarding brake light defect complaints in GM brand vehicles that had not yet been recalled. Then, in June 2012, NHTSA provided New GM with additional complaints "that were outside of the build dates for the brake lamp malfunctions on the Pontiac G6" vehicles that had been recalled.[15]

40.     In February 2013, NHTSA opened a "Recall Query" in the face of 324 complaints "that the brake lights do not operate properly" in Pontiac G6, Malibu, and Aura vehicles that had not yet been recalled.[16]

41.     In response, New GM asserts that it "investigated these occurrences looking for root causes that could be additional contributors to the previously identified fretting corrosion," but that it continued to believe that "fretting corrosion in the [Body Control Module] C2

---

[12] *Id.* at 2.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.* at 3.

connector" was the "root cause" of the brake light defect.[17]

42. In June 2013, NHTSA upgraded its "Recall Query" concerning the BCM Defect to an "Engineering Analysis."[18]

43. In August 2013, New GM was tracking an elevated warranty rate for Body Control Module C2 connectors in vehicles built *after* Old GM had begun applying dielectric grease to BCM C2 connectors at its assembly plants in November 2008.[19] By November 2013, New GM concluded that "the amount of dielectric grease applied in the assembly plant starting November 2008 was insufficient....[20]"

44. Finally, in March 2014, "[New] GM engineering teams began conducting analysis and physical testing to measure the effectiveness of potential countermeasures to address fretting corrosion. As a result, New GM determined that additional remedies were needed to address fretting corrosion."[21]

45. On May 7, 2014, New GM finally decided to conduct a safety recall for the more than 2 million vehicles affected by the BCM Defect.

46. As the recall remedy, New GM has directed dealers "to attach the wiring harness to the [Body Control Module] CM with a spacer, apply dielectric lubricant to both the [Body Control Module] CR and harness connector, and on the BAS and harness connector, and relearn the brake pedal home position."[22]

47. Both Old and New GM failed to act upon and concealed knowledge of the BCM Defect for years, and did not even consider implementing available countermeasures

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.* at 4.
[22] *Id.*

(other than the application of grease that had proven ineffective) until March 2014.

48.    Throughout the years in which it received scores of brake light complaints, Old and New GM marketed GM brand vehicles as safe. For example, in a section called "Safety," Old GM's Chevrolet website stated:

**OUR COMMITMENT**

"Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe – from the start of your journey to your destination. That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind."

49.    Similarly, Old GM promoted its Saturn vehicle line with television advertising tag lines like, "Putting people first," and, "Saturn. People First." Saturn's print ad campaign featured advertisements with statements such as the following: "Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars." In sum, in order to increase sales, Old GM touted the safety of its vehicles, and New GM did nothing to correct the false representations of safety to the millions of vehicle owners whose cars were affected by the BCM Defect. Further, throughout the existence of both Old and New GM, GM dealerships continued to sell "certified pre-owned cars" that still had the BCM Defect. New GM, which profited indirectly from these sales, certified the safety of these vehicles to the public, explaining that the certification process involved testing of over a hundred components, including the braking system. This safety certification was made despite many of the affected vehicles still having the defective BCM condition. As a result, many owners and users of the affected vehicles purchased and drove the vehicles in reliance upon these fraudulent safety representations and/or omissions of material facts regarding the safety of such vehicles, including the Plaintiffs.

50.     On July 9, 2009, the United States Bankruptcy Court approved the sale of Old GM, which was converted into Defendant New GM.  From its inception, New GM, which retained the vast majority of Old GM's senior and management level executives and engineers, knew that Old GM had manufactured and sold millions of vehicles afflicted with the BCM Defect.

51.     On or around the day of its formation as an entity, New GM also acquired, *inter alia*, the knowledge of the contents of Old GM's "files" and company "documents."  To that end, New GM acquired notice of the safety-related defects contained in Old GM's files, including numerous engineering reports, investigative reports, failure analyses, technical service bulletins, and other documentation concerning the defective BCM system described herein.

52.     Defendant New GM also had ongoing obligations under the Safety Act to monitor both Old GM and New GM vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years.  Defendant New GM expressly accepted Safety Act responsibilities for Old GM vehicles in § 6.15 of the Sale Agreement through which it acquired Old GM.

53.     The Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including incidents involving death or injury, claims relating to property damage received by the manufacturer, warranty claims paid by the manufacturer, consumer complaints, and field reports prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.  Manufacturers must retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  49 C.F.R. §§ 576.5 to 576.6.

54. The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. United States v. General Motors Corp., 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c). Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

55. Defendant New GM used several processes to identify safety issues, including the TREAD database and Problem Resolution Tracking System ("PRTS"). The TREAD database, used to store the data required for the quarterly NHTSA early warning reports, was the principal database used by Old and New GM to track incidents related to Old and New GM vehicles. Id. at 306. The database included information from (i) customer service requests; (ii) repair orders from dealers; (iii) internal and external surveys; (iv) field reports from employees who bought Old and New GM vehicles and from Captured Test Fleet reports; (v) complaints from the OnStar call center; and (vi) a database maintained by Old and New GM legal staff to track data concerning

complaints filed in court. A TREAD reporting team would conduct monthly database searches and prepare scatter graphs to identify spikes in the number of accidents or complaints related to various Old and New GM vehicles. The PRTS is a database that tracks engineering problems identified in testing, manufacturing, through warranty data, and through customer feedback. The PRTS process involves five steps: identification of the issue; identification of the root cause; identification of a solution; implementation of the solution; and feedback.

56. Because the same employees carried out the TREAD Act obligations at Old GM and Defendant New GM, they not only retained the knowledge they acquired at Old GM—they were in fact required to do so. This further supports the propriety of imputing the knowledge of Old GM employees to New GM, even where that knowledge stems in part from their performance of the same or similar roles at Old GM.

57. In setting forth the knowledge and conduct of Old GM in connection with the BCM defect and other defects set forth herein, Plaintiffs allege that New GM is liable for the actions of Old GM only with respect to the claims for compensatory damages which are an Assumed Liability. With respect to Plaintiffs' Independent Claims, Plaintiffs do not seek to hold Defendant New GM liable for the actions of Old GM. Instead, the knowledge and conduct of Old GM is generally important and relevant because it is imputed to Defendant New GM under governing principles of agency law.

58. At least as early as September 2008, Old GM engineers knew that the Chevrolet Body Control Modules of Chevrolet Malibu and other similar platform vehicles were defectively designed as discussed in this Complaint.

59. Pursuant to 49 C.F.R. § 573.6, which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety," Old GM had

a duty to disclose the safety-related defects in the Chevrolet Malibu and all other Subject Vehicles no later than five (5) days after discovery said safety defect.

60. Instead of complying with its legal obligations, however, Old GM fraudulently concealed the BCM defect from the public and continued to manufacture and sell the Subject Vehicles with known safety defects.

61. Old GM's concealment and obfuscation was not limited to its dealing with NHTSA. In the 2008 iteration of its annual "Vehicle Recall Awareness Presentation," Old GM instructed its employees to avoid using the following "judgment" words in their descriptions of vehicle problems:

| | | |
|---|---|---|
| always | detonate | maniacal |
| annihilate | disemboweling | mutilating |
| apocalyptic | enfeebling | never |
| asphyxiating | evil | potentially-disfiguring |
| bad | evicscerated [sic] | power [sic] keg |
| Band-Aid | explode | problem |
| big time | failed | safety |
| brakes like an "X" car | flawed | safety related |
| cataclysmic | genocide | serious |
| catastrophic | ghastly | spontaneous combustion |
| Challenger | grenadelike | startling |
| chaotic | grisly | suffocating |
| Cobain | gruesome | suicidal |
| condemns | Hindenburg | terrifying |
| Corvair-like | hobbling | Titanic |
| crippling | horrific | tomblike |
| critical | impaling | unstable |
| dangerous | inferno | widow-maker rolling sarcophagus (tomb or coffin) |
| deathtrap | Kevorkianesque | Words or phrases with biblical connotation |
| debilitating | lacerating | |
| decapitating | life-threatening | |
| defect | maiming | |
| defective | mangling | |

62.     Instead of using commonsense language, Old GM employees were advised in Orwellian fashion to use specific words to avoid disclosure and documentation of the material safety risks associated with Old GM products, and in so doing furthered the cover-up and fraud through intentional (and misleading) word substitutions, such as:

- "Issue, Condition [or] Matter" instead of "**Problem**"

- "Has Potential Safety Implications" instead of "**Safety**"

- "Does not perform to design" instead of "**Defect/Defective**"

63.     Old GM knew its defective vehicles were killing and/or maiming its customers, but it nonetheless instructed its employees to avoid words like "defect" or "safety"—words that accurately described the issues.  Instead of publicly admitting the dangerous safety defects in its vehicles, Old GM repeatedly blamed accidents on driver error.

64.     Upon information and belief, Old GM's policy against "judgment" words, and linguistic obfuscation in general, was adopted and continued on by New GM after the bankruptcy sale.

**D.     New GM Concealed a Known Defect After the Bankruptcy Sale**

65.     From its inception, New GM had full knowledge of the defects with the BCM, and Old GM's failure to disclose those defects to NHTSA and the public—or, for that matter, to the Bankruptcy Court.  Had New GM acted when it acquired knowledge of the BCM defect, Plaintiffs Sabrina Bell and Olga Bell would likely not have been involved in an accident on October 8, 2011—more than two years after New GM acquired Old GM's assets in the bankruptcy sale.

66.     Rather than promptly recalling the Defective Vehicles, however, New GM fraudulently concealed the existence of the safety defects in the Defective Vehicles.  Moreover, New GM continued to manufacture vehicles with the BCM defect after it emerged from

bankruptcy. Indeed, hundreds of thousands of the vehicles manufactured by New GM have since been recalled due to the BCM defect.

67.     Under 49 C.F.R. § 573.6, Old GM had a duty no later than 2008 and New GM had a duty no later than 2009, when each entity clearly was aware of the BCM Defect, to disclose the defect in the Subject Vehicles. Rather than comply with its legal obligations, New GM continued to fraudulently conceal this defect from the public and the U.S. government.

68.     Had Old GM or New GM complied with its obligations under § 573.6, a recall would have been implemented far earlier, and Sabrina Bell's Chevrolet Malibu may have been repaired prior to October 8, 2011.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

69.     Any statutes of repose or limitation are tolled because of New GM's fraudulent concealment of the BCM defect, and conduct equivalent to that required for a finding of willful and wanton conduct against GM.

70.     Further, Old GM and New GM were under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of the Subject Vehicles. Yet, Old GM and New GM actively concealed the true character, quality, and nature of the vehicles, preventing Plaintiffs from discovering the true facts regarding the cause of their injuries. Based on the foregoing, New GM is estopped from relying on any statutes of limitations or statute of repose in defense of this action.

71.     Even after Plaintiffs' crash, because of Old GM's and New GM's active concealment of the defect, Plaintiffs had no reason to know the sudden loss of brake light functionality, panic braking assist, and ESC was caused by a defect in the BCM until she became aware that her vehicle was recalled.

# VI.   CLAIMS AGAINST GENERAL MOTORS, LLC, BROUGHT BY PLAINTIFFS

## Count I: Negligence, Gross Negligence, Negligence *Per Se*, Negligent Failure to Warn

72.    Plaintiffs re-allege as if fully set forth, each and every allegation set forth in this Amended Complaint.

73.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets, New GM assumed liability for crashes involving Old GM vehicles causing personal injury, loss of life or property damages.  New GM also acquired knowledge of Old GM's activities and the BCM defect, and other serious defects, via the mind of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order.  Thus, the duties of Old GM are part of the foundation for the product liability assumed by New GM. Further, Plaintiffs' claims stem from a crash involving an Old GM vehicle that caused Plaintiffs' personal injury and property damage and New GM is therefore liable to the Plaintiffs.

74.    Old GM owed Plaintiffs a duty to design, manufacture, fabricate, assemble, inspect, market, distribute, sell, and/or supply products in such a way as to avoid harm to persons using them such as the Plaintiffs.

75.    Old GM was negligent in designing, manufacturing, and providing warnings for the Chevrolet Malibu, as set forth in the paragraphs above.  Old GM acted unreasonably in manufacturing and selling vehicles with design, manufacturing, and informational defects and concealing such defects from Plaintiff, the public, and NHTSA.

76. Old GM and New GM owed the Plaintiffs a duty to detect known safety defects in GM vehicles.

77. Old GM and New GM owed the Plaintiffs a duty, upon discovering the safety defect, to provide thorough notice of the defect, including a warning that the Defective Vehicles were not safe and should not be driven until an appropriate repair procedure was performed.

78. Old GM and New GM owed the Plaintiffs a duty, upon discovery of the safety defect, to ensure that an appropriate repair procedure for the BCM Defect was developed and made available to drivers.

79. Old GM and New GM knew that their customers, such as the Plaintiffs, expect that the company will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure.

80. The duties of Old GM and New GM to discover, provide notice of, and provide repair procedures for safety related defects exist for the benefit of the Plaintiffs and other drivers of GM brand vehicles, and Old-to-New GM employees breached these duties to the Plaintiffs. Old GM and New GM were aware that by providing maintenance and repair information and assistance, including through its authorized dealerships, Old GM and New GM had a responsibility to the Plaintiffs and other drivers to take the reasonable measures listed above.

81. In addition, Old GM and New GM's failure to notify NHTSA and Old GM vehicle owners of safety-related defects as required by 49 U.S.C. §30101, et seq. and 49 C.F.R. §§573, 577 constituted negligence *per se*. These statutes and regulations were enacted for the protection and safety of the public.

82. Old GM had a duty to ensure that its vehicles were reasonably safe to operate and did not contain defective components, and to produce vehicles with appropriate warning

instructions. When Old GM learned that the 2008 Chevrolet Malibu was defective, it had a continuing duty to warn Plaintiffs of the existence of the defect, including after the original sale of the vehicle.

83. New GM was also negligent in providing warnings about Plaintiffs' Chevrolet Malibu and unreasonably concealing the design, manufacturing, and informational defects that New GM knew existed in Old GM vehicles. New GM had a continuing duty to monitor Old GM vehicles for safety-related defects and warn Plaintiffs, the public, and NHTSA about safety-related defects in Old GM vehicles. This duty is based on the direct and continuing relationship between New GM and the owners of Old GM vehicles. Among other things, New GM had a statutory duty to warn owners of Old GM vehicles, including Plaintiff, of safety defects and did, in fact, warn owners of Old GM vehicles, including Plaintiff, of the safety defects (though the warning arrived years later than it should have and unreasonably minimized the risk of harm).

84. In addition, New GM's failure to notify NHTSA and Old GM vehicle owners of safety-related defects as required by 49 U.S.C. §30101, et seq. and 49 C.F.R. §§573, 577 constituted negligence per se. These statutes and regulations were enacted for the protection and safety of the public.

85. By reason of New GM's assumption of certain liabilities under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for crashes involving Old GM vehicles causing personal injury, loss of life or property damages, the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by the Plaintiffs were among the liabilities of Old GM assumed by New GM.

86. Old GM had a continuing duty, after the initial sale of Plaintiff's 2008 Chevrolet Malibu, to warn Plaintiffs of the risk of harm relating to the defective 2008 Chevrolet Malibu. A

reasonable person in Old GM's position would have provided such a warning, and Old GM failed to provide such a warning.

87.     Old GM knew that the 2008 Chevrolet Malibu posed a substantial risk of harm to persons or property. Plaintiffs (and other owners of the Defective Vehicles) were identifiable by New GM as evidenced by the subsequent recall it issued relating to the defects in the 2008 Chevrolet Malibu. Plaintiffs like Sabrina Bell and Olga Bell could reasonably be presumed to have been unaware of the risk of harm, a warning could have been effectively communicated to and acted on by Plaintiffs, and the risk of harm was sufficiently great to justify such a warning. In fact, the harm to Plaintiffs did occur and was devastating.

88.     New GM is independently liable for its own post-sale failure to warn.  New GM undertook and agreed to provide services for maintenance or repair of the Subject Vehicle, and entered into a similar relationship with purchasers of the Old GM's products giving rise to actual or potential economic advantage to the successor, and a reasonable person in the position of New GM would have provided a warning

89.     Independent of any failures by Old GM as described herein, New GM breached its duties to the Plaintiffs by failing to provide appropriate notice of and repair procedures for the Defective Vehicle.  In doing so, New GM departed from the reasonable standard of care required of it.

90.     New GM breached the duty described above, in that New GM negligently and carelessly failed to warn Plaintiffs of the inherently dangerous condition of the Subject Vehicle and failed to inspect or test the Defective Vehicles (including the Subject Vehicle) to determine whether they were reasonably fit for their intended uses.

91.     It was foreseeable that if New GM did not provide appropriate notice and repair

procedures for the Defective Vehicles, the Plaintiffs and other drivers would be endangered.

92.     The Plaintiffs' injuries were reasonably foreseeable to both Old GM and New GM.

93.     The Plaintiffs could not through the exercise of reasonable diligence have prevented the injuries caused by Old GM and New GM's negligence and gross negligence.

94.     Old GM's and New GM's acts and omissions, when viewed objectively from the actor's standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Old GM and New GM nevertheless proceeded with conscious indifference to the rights, safety and welfare of others.

95.     The Plaintiffs' physical and emotional injuries were proximately caused by New GM's negligent acts and omissions.

96.     New GM is liable for compensatory damages based on Old GM's conduct and for compensatory and punitive damages based on New GM's own independent conduct.  New GM is further liable for fair and reasonable damages for pain and suffering, medical expenses, and/or damages as may be determined by the Court or the jury, as well as costs, expenses, and reasonable attorneys' fees.

97.      As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

**Count II: Fraud, Consumer Fraud, Fraudulent Misrepresentation, Fraudulent Concealment**

98.      Plaintiffs re-allege as if fully set forth, each and every allegation set forth in this Amended Complaint.

99. As discussed above, Old GM began receiving customer complaints regarding the BCM Defect at least as early as 2008, and despite the fact that many Old GM employees continued on in their same employment roles at New GM and New GM acquired the files, books, and knowledge of the BCM defect altogether, neither Old nor New GM advised the Plaintiffs that a defect affecting motor vehicle safety existed in Plaintiff's vehicle until after Recall No. 14V-252 in 2014.

100. As set forth above, Old GM and New GM intentionally concealed or failed to disclose material facts related to the BCM Defect from the Plaintiffs, the public, and NHTSA. In addition, Old GM and New GM failed to timely disclose the other serious and potentially life-threatening defects in the Defective Vehicles within such time and in such manner as to prevent the Plaintiffs' injuries.

101. As set forth above, New GM misrepresented the safety of Old and New GM vehicles, including the Subject Vehicle.

102. Additionally, New GM possessed independent knowledge of the defects in the Plaintiff's Defective Vehicle and the need to undertake multiple design steps to resolve those defects to prevent injury to vehicle occupants such as Plaintiffs. This knowledge was based, in part, on the information from records, files, reports and other documents and materials regarding the BCM Defect, maintained by Old GM, all of which were included in the assets purchased by New GM during the bankruptcy sale.

103. New GM had a duty to disclose material facts to Plaintiffs when New GM knew: (1) that the Plaintiffs were ignorant of material facts that New GM did not disclose and/or intentionally concealed; and (2) the Plaintiffs did not have an equal opportunity to discover the material facts that New GM did not disclose and/or intentionally concealed.

104.     More specifically, Plaintiffs enjoyed a special relationship with New GM which created a duty, in that Plaintiffs reasonably imparted special confidence in New GM by expecting that New GM would recall Old GM vehicles if it knew of a safety defect in Old GM vehicles. New GM reasonably knew of this confidence, as evidenced by the many recalls in 2014 involving Old GM vehicles. New GM intentionally did not disclose the defect because of the longtime GM culture of hiding safety defects that could lead to costly recalls for the company. By failing to disclose these material facts, New GM intended to induce the Plaintiffs to take some action or refrain from acting. Plaintiffs were unaware of the BCM defect in the Subject Vehicle prior to the crash and had they been given the choice would not have chosen to use a vehicle that posed the risk of serious injury or death due to a defective condition. As a result of New GM's fraud, fraudulent concealment and fraudulent non-disclosure, Plaintiffs sustained physical and emotional injuries and damages described further below.

105.     New GM also had a duty to disclose because it made many general affirmative representations about the safety and quality of GM-branded vehicles, which included Old GM vehicles like Plaintiff Sabrina Bell's 2008 Chevrolet Malibu. These affirmative representations were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding GM's actual safety record, safety philosophy, and practices and the actual safety defects in said vehicles.  Having volunteered to provide information to the public, including the Plaintiffs, New GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they implicated serious safety risks, and whether an automobile manufacturer stands behind the products whose safety it is responsible for ensuring are material concerns to consumers, including the Plaintiffs.

106. New GM knew that Plaintiffs had no knowledge of the concealed facts, and that they did not have an equal opportunity to discover the concealed facts. New GM was in a position of superiority over Plaintiffs. Indeed, Plaintiffs trusted New GM not to allow defective vehicles for which it was responsible to remain in the marketplace. Plaintiffs further trusted New GM to warn of defects and to recall defective vehicles.

107. By deliberately concealing these material facts, New GM intended to hide information regarding the defect, mislead, avoid suspicion, or prevent further inquiry into the matter by NHTSA, Plaintiffs, and the public in general. New GM further intended to induce NHTSA not to recall the Subject Vehicle, as well as other Defective Vehicles, in order to reduce its eventual financial exposure.

108. Sabrina Bell would not have purchased the Chevrolet Malibu had she known of the BCM and other defects.

109. The Plaintiffs relied on New GM's non-disclosure and were injured as a result of acting without knowledge of the undisclosed facts. Had adequate notice and instructions been provided, Plaintiffs would not have driven or used the Defective Vehicle, and would not have been at risk of and indeed suffered the harmful injuries described herein. The Defendant failed to provide warnings of such risks and dangers and failed to fix the defective condition in a timely manner.

110. New GM reaped the benefit of the sales and leases from the Subject Vehicles because it did not disclose the defects to the public or to NHTSA. Additionally, in not disclosing the Subject Vehicles' defects, New GM prevented any meaningful investigation of accidents that were likely the result of those defects. Further, because New GM had not placed this matter before

NHTSA or the public, cars and components in those other similar accidents were disposed of without the appropriate and adequate investigation.

111.    New GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost New GM money, and it did so at the expense of Plaintiffs' safety.

112.    As a direct and proximate result of New GM's wrongful conduct, fraud and fraudulent concealment, Plaintiffs suffered damages described herein.

113.    New GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs, such that punitive damages are appropriate.

**Count III: Strict Products Liability**

114.    Plaintiffs re-allege as if fully set forth, each and every allegation set forth in this Amended Complaint.

115.    At all times relevant herein, both Old GM and Defendant New GM both are and were a "manufacturer" of motor vehicles under applicable law and are and were in the business of manufacturing, designing, testing, assembling, planning, engineering, constructing, building, inspecting, marketing, advertising, distributing, and selling motor vehicles directly and/or by and through various agencies and distributors in the State of Nevada.

116.    At all times relevant herein, both Old GM and Defendant New GM (by reason of inherited information or information independently acquired by it) knew or, in the exercise of reasonable diligence, should have known that the BCM functionality problems in the Subject Vehicle rendered the product a dangerous instrumentality if not properly designed, manufactured, tested, or inspected and that the Vehicle, therefore, presented the probability of

harm to any foreseeable users unless it was free from all defects.

117. At all times relevant herein, both Old GM and Defendant New GM (by reason of inherited information or information independently acquired by it) also knew or, in the exercise of reasonable diligence, should have known that the BCM functionality in the Subject Vehicle was defective and/or unable to withstand the Vehicle's normal and reasonable operations in the normal course, but did not adequately recall, remedy, warn, or protect against the problem prior to the time that Plaintiffs' accident occurred.

118. At all times relevant herein, Old and New GM did not take reasonable care and Defendant New GM negligently and carelessly failed to warn Plaintiffs of the inherently dangerous condition of the Vehicle and failed to inspect or test the Vehicle to determine whether it was reasonably fit for its intended uses prior to the Incident on October 8, 2011.

119. At all times relevant herein, both Old GM and Defendant New GM, as an automotive manufacturer in the industry, owed a duty to consumers and to the public, including Plaintiffs, to truthfully disclose safety threats and/or any other pertinent information about both its vehicles and vehicles manufactured by Old GM.

120. At all times relevant herein, both Old GM and Defendant New GM concealed and suppressed material facts concerning the many serious defects plaguing Old and New GM vehicles, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

121. At all times relevant herein, both Old GM and New GM made certain representations to the Plaintiffs and the public that the vehicles it designed, manufactured, assembled, installed, sold, and/or placed into the stream of commerce, including but not limited to the Vehicle at issue in this Complaint, were free from defects, reasonably fit for general use,

and safe for their intended purpose.

122.     At all times relevant herein, such representations made by Old GM and New GM were false, as the Vehicle it designed, manufactured, assembled, installed, sold, and/or placed into the stream of commerce was not free from defects, reasonably fit for its general use, and/or safe for its intended purpose.

123.     Defendant New GM actively concealed the true character, quality, and nature of the vehicles, including Plaintiff Sabrina Bell's Vehicle, and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of those vehicles from/to the Named Plaintiffs.

124.     At all times relevant herein, Plaintiffs reasonably relied upon Old GM's and Defendant New GM's knowing and affirmative misrepresentations and/or active concealment of these facts.

125.     At all times relevant herein, the product did not conform to any express or implied warranty made at any time by the manufacturer about the product. The warranties made by the manufacturer induced the Plaintiffs to use the product, and the Plaintiffs' damages were proximately caused because the warranty was untrue.

126.     New GM is liable to Plaintiffs for non-punitive damages based on Old GM's conduct.

127.     New GM is liable to Plaintiffs for punitive damages based solely on New GM's knowledge and conduct, including information inherited from Old GM and obtained by New GM after the Sale.

128.     In addition, under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement, New GM expressly assumed liability for post-sale accidents involving Old

GM vehicles causing personal injury, loss of life, or property damages. Plaintiffs have claims for a post-sale accident involving an Old GM vehicle that caused personal injury or property damage and New GM is therefore expressly liable to Plaintiffs for Old GM's conduct under the applicable law of strict products liability.

129. Old GM manufactured Plaintiff Sabrina Bell's 2008 Chevrolet Malibu. However, Defendant New GM had a duty to ensure that its vehicles, and those for which it had assumed liability, were reasonably safe to operate and did not contain defective components. When Defendant New GM learned that the 2008 Chevrolet Malibu contained a defective component, it had a duty to warn Plaintiffs of the existence of the defect in clear and non-misleading terms.

130. The Subject Vehicle was defective in that it failed to perform in the manner reasonably to be expected in light of its nature and intended function and was more dangerous than would be contemplated by the ordinary user (such as Plaintiffs) having the ordinary knowledge available in the community.

131. When it manifested in connection with the Subject Incident, the BCM Defect presented an unexpected, dangerous malfunction rendering the Subject Vehicle unreasonably dangerous and constituting a product defect for which New GM should be strictly liable.

132. Plaintiff's 2008 Chevrolet Malibu was defective and unreasonably dangerous because the harmful characteristics or consequences of its design outweigh the benefits of its design. In light of the allegations contained herein, it was unreasonable for Old GM to put Plaintiff's 2008 Chevrolet Malibu on the market without changing the design—and a safer alternative design was available as evidenced by recall repairs eventually implemented by New GM. In addition, Plaintiff's 2008 Chevrolet Malibu failed to perform as safely as an ordinary consumer would expect when the product is used in a reasonably foreseeable manner.

133. Plaintiff Sabrina Bell's 2008 Chevrolet Malibu was also defective and unreasonably dangerous because of a manufacturing defect. Plaintiff's 2008 Chevrolet Malibu contained a condition which Old GM did not intend and, as a result, it failed to perform as safely as an ordinary consumer would expect when the product is used in a reasonably foreseeable manner.

134. Plaintiff Sabrina Bell's 2008 Chevrolet Malibu was also defective and unreasonable dangerous because it did not have an adequate warning. Plaintiffs would have heeded an adequate warning. Had a proper warning been given, Plaintiffs' injuries would not have occurred.

135. Old GM had a legal duty to design, inspect, test, manufacture, and assemble the Chevrolet Malibu so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use. Old GM also had a duty to warn of the foreseeable risks of harm from using the 2008 Chevrolet Malibu.

136. Old GM failed to provide an adequate warning to Plaintiffs of the defect in the 2008 Chevrolet Malibu.

137. But for the defects in the Subject Vehicle, Plaintiffs' injuries would not have occurred.

138. The defective nature of the Chevrolet Malibu was the proximate cause of Plaintiffs' damages, as set forth herein, thus rendering New GM strictly liable for compensatory damages, as well as for other damages such as costs, expenses, and reasonable attorneys' fees, based on Old GM's conduct and based on New GM's.

139. In addition, Plaintiffs' injuries and losses were caused by New GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling and/or

supplying the subject automobile in a defective condition for which it is strictly liable to the Named Plaintiffs pursuant to Restatement (Second) of Torts § 402A. Alternatively, the injuries and losses were caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling and/or supplying the subject automobile in a defective condition for which New GM is strictly liable to the Named Plaintiffs pursuant to Restatement (Second) of Torts § 402A because these liabilities were expressly assumed by New GM.

140.    Plaintiffs' injuries were caused by New GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling and/or supplying the subject automobile without proper and adequate warnings, instructions, and/or guidelines for safe use for which it is strictly liable to the Plaintiffs. Alternatively, these injuries were caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling and/or supplying the subject automobile without proper and adequate warnings, instructions, and/or guidelines for safe use for which New GM is strictly liable to the Plaintiffs because these liabilities were expressly assumed by New GM.

141.    As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

## VII.    DAMAGES

142.    Plaintiffs pray for damages against New GM in a sum of money in excess of the jurisdictional amount of Seventy-Five Thousand Dollars ($75,000.00) plus costs and any such other relief to be deemed just and equitable to which they are entitled.

143.    Plaintiffs' bodily injuries were directly and proximately caused by Old GM's and New GM's conduct and omissions.  Accordingly, Plaintiffs are entitled to reasonable and proper compensation for the following legal and actual damages:

      a.      past and future medical expenses;

      b.      past and future pain and suffering, including for emotional injury;

      c.      past and future disfigurement and loss of function;

      d.      prospective medical care and medication costs

      e.      past lost wages and future lost wage-earning capacity; and

      f.      property damage to the Subject Vehicle sustained in the crash.

## VIII.  PUNITIVE DAMAGES FOR INDEPENDENT CLAIMS BASED ON NEW GM'S KNOWLEDGE AND CONDUCT

144.    Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

145.    Plaintiffs would further show that the evidence in this case will prove that New GM acted with reckless disregard of the health and safety of others in that when it knew or should have known that there was the extreme risk of danger vis-a-vis the use and operation of the Defective Vehicle and other Old GM and New GM vehicles with the same defect, and that New GM nevertheless proceeded with indifference to the rights, safety, or welfare of others, including Plaintiffs.  Therefore, Plaintiffs seek punitive damages against New GM.

146.    Alternatively, Plaintiffs would further show that the evidence in this case will prove that New GM acted intentionally and with malice in that when it knew or should have known that there was the extreme risk of danger vis-a-vis the use and operation of Plaintiff Sabrina Bell's Defective Vehicle and other Old GM and New GM vehicles with the same defect, and that New GM nevertheless proceeded with indifference to the rights, safety, or welfare of others, including

the Plaintiffs. Therefore, Plaintiffs seek punitive damages against New GM.

## IX.     JURY DEMAND

147.     Plaintiffs request a trial by jury.

## X.     PRAYER

148.     For the foregoing reasons, Plaintiffs pray that New GM be cited to appear and answer herein, and that upon final hearing of the cause, judgment be entered for the Plaintiffs against New GM for actual damages, as alleged, and exemplary or punitive damages, subject to proof and the limitations of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG); together with pre-judgment interested (from the date of injury through the date of judgment) at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of court; and such other and further relief to which Plaintiffs may be entitled at law or in equity.

Dated: April 30, 2018

**Respectfully Submitted,**

**HILLIARD MARTINEZ GONZALES LLP**

By: /s/   *Robert C. Hilliard*
Robert C. Hilliard
Texas State Bar No. 09677700
Federal ID No. 5912
bobh@hmglawfirm.com
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Telephone No.: (361) 882-1612
Facsimile No.: (361) 882-3015

-and-

Thomas J. Henry
Texas State Bar No. 09484210
Federal ID No. 12980

tjh@tjhlaw.com

**THOMAS J. HENRY INJURY ATTORNEYS**
521 Starr St.
Corpus Christi, TX 78401
Telephone No.: (361) 985-0600
Facsimile No.: (361) 985-0601

**ATTORNEYS FOR PLAINTIFFS**